## UNITED STATES BANKRUPTCY COURT
### FOR THE
### DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**DIEGO A. OSORNO**
**a/ka DIEGO A. OSORNO PEREZ**
**d/b/a SU CASA Y MAS**
 **d/b/a YOUR HOME MORTGAGE**,              Chapter 7
　　　Debtor                                          Case No. 10-17976-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**ARSENIA RODRIGUES, CARMEN**
**MENDOZA, JOSE ALVAREZ, ALTMAN**
**RILEY ESHER LLP, AND GREATER**
**BOSTON LEGAL SERVICES,**
　　　Plaintiffs
v.                                                    Adv. P. No. 10-1297
**DIEGO A. OSORNO**
**a/ka DIEGO A. OSORNO PEREZ**
**d/b/a SU CASA Y MAS**
 **d/b/a YOUR HOME MORTGAGE**,
　　　Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

### MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the three-count Amended Complaint filed by

Plaintiffs, Arsenia Rodrigues, Carmen Mendoza, Jose Alvarez (collectively, the "Individual

Plaintiffs"), Altman Riley Esher LLP, and Greater Boston Legal Services (collectively, the

"Plaintiffs"), against Diego A. Osorno, d/b/a Su Casa Y Mas, d/b/a/ Your Home Mortgage

(the "Defendant" or the "Debtor")  pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(4) and (a)(6).

1

The Court conducted a two-day trial beginning on June 20, 2012 at which four witnesses testified, including the Defendant, and 32 exhibits were submitted into evidence. The Court now makes its findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052. Critical issues include whether the Debtor is personally liable for the conduct of the limited liability companies which he managed and partially owned, and whether the Plaintiffs sustained their burden of proof.

**II. FACTS**

A. <u>Agreed Facts</u>

The Debtor filed a voluntary Chapter 7 petition on July 23, 2010, listing "Su Casa Y Mas" and "Your Home Realty" as other names used in the last eight years. On Schedule F-Creditors Holding Unsecured Nonpriority Claims, the Debtor listed the Plaintiffs as holders of contingent, unliquidated, and disputed claims. Their claims arise out of a Complaint filed by the Individual Plaintiffs against two limited liability companies, Your Home Mortgage, LLC ("Your Home") and Sue Casa Y Mas, LLC ("Su Casa"), in the Suffolk Superior Court, Department of the Trial Court in which the Individual Plaintiffs obtained default judgments, including attorneys' fees, against both defendants, but not the Debtor who was not a defendant in the state court action. The Individual Plaintiffs, who were represented by Altman Riley Esher, LLP and Greater Boston Legal Services, sought damages and attorneys' fees for violations of Mass. Gen. Laws ch. 93A, § 11 and Mass Gen. Laws ch. 151B. The Superior Court on December 15, 2009 entered a judgment in favor of Arsenia Rodrigues ("Rodrigues") in the sum of $154,000, a judgment in favor of Carmen

2

Mendoza ("Mendoza") in the sum of $103,000 and a judgment in favor of Jose Alvarez ("Alvarez") in the sum of $43,000.  Prior to the entry of the judgments, the Superior Court issued a Memorandum of Decision on Assessment of Damages in which it doubled the damages proven by the Individual Plaintiffs.  In addition, as noted above, the Superior Court awarded the Individual Plaintiffs their attorneys' fees. Specifically, it determined that Greater Boston Legal Services was entitled to reimbursement  of $17,995.30 for services performed and that Altman Riley Esher LLP was entitled to reimbursement of $17,206.60 for services performed and $635 for out-of-pocket expenses incurred.

Prior to the commencement of the trial, the parties filed a Joint Pre-Trial Memorandum in which they set forth "Admitted Facts Not Requiring Proof." The admitted facts are summarized as follows:

> Your Home Mortgage, LLC was organized in Massachusetts on March 1, 2004.  It filed a Certificate of Cancellation on June 18, 2009.  It was engaged in the business of originating mortgages.

> Su Casa Y Mas, LLC was organized in Massachusetts on January 14, 2005. It filed a Certificate of Cancellation on November 27, 2009. It was engaged in the business of acting as a real estate broker. It also did business in Georgia.

> The reason listed in both Your Home's and Su Casa's Certificate of Cancellation was "company insolvency."

> Su Casa Y Mas, LLC did business under the name "Your Home Realty."

> Mauricio Osorno ("M. Osorno") is the Defendant's brother.  During the period between 2004 and 2007, Ricardo Villamil ("Villamil") was the Defendant's brother-in law.

> The Defendant, M. Osorno, and Villamil each owned a one-third ownership/membership interest in Su Casa and Your Home from the time of

3

their organization until 2007.

The Defendant and M. Osorno each owned a one-half ownership/membership interest in Su Casa and Your Home from 2007 until the time of their dissolution.

The Defendant has had an ownership/membership interest in the following entities:

1. Your Home Mortgage, LLC
2. Su Casa Y Mas, LLC
3. Osorno-Villamil Properties, LLC
4. Osorno Insurance, LLC
5. DMR Properties LLC
6. HT Villamil, LLC
7. Presidential Title, LLC

From the time of their organization until 2006, both Your Home and Su Casa had offices located at 48 Maverick Square, #3, Boston, Massachusetts.

From 2005 until the time of their dissolution, Your Home and Su Casa had offices located at 111 Everett Avenue, Suites 2D and 2E, Chelsea, Massachusetts.

From 2005 until March 2010, the condominium located at 111 Everett Avenue, Suites 2D and 2E, Chelsea, Massachusetts was owned by DMR Properties LLC.

The Defendant owned a one-third membership interest in DMR Properties LLC ("DMR") from 2005 until 2007.

From 2005 until 2007, Osorno Insurance, LLC ("Osorno Insurance") had an office located in Lexington, Massachusetts. From 2006 until the time of its dissolution, it had an office located at 111 Everett Avenue, Suites 2D and 2E, Chelsea, Massachusetts.

From 2005 until March 2010, DMR and Osorno-Villamil Properties, LLC did business from time to time at 111 Everett Avenue, Suites 2D and 2E, Chelsea, Massachusetts.

Your Home and Su Casa paid rent to DMR.

4

Your Home and Su Casa provided their customers with an "Affiliated Business Arrangement Disclosure Statement," informing them that a business relationship existed between Your Home, Su Casa, and Osorno Insurance, and that "[t]he nature of the relationship is that the individuals who are owners, shareholders and/or directors and officers in [Your Home Mortgage, LLC] also serve as owners, shareholders and/or officers and directors in [Su Casa Y Mas, LLC] and in [Osorno Insurance, LLC]."

Shareholder meetings, board meetings, and manager meetings were held by Your Home and Su Casa; sometimes the meetings for Your Home and for Su Casa were conducted at the same time and reported on the same minutes.

The majority of the employees hired by Your Home and Su Casa were Latino and Spanish-speaking.

Nohora Ortiz ("Ortiz") was a loan officer employed by Your Home who originated the loans to Individual Plaintiffs Rodrigues, Mendoza, and Alvarez.

Luis Jaramillo ("Jaramillo") was a sales agent employed by Su Casa who was the procuring agent for the real estate purchased by Individual Plaintiffs Rodrigues, Mendoza, and Alvarez.

Your Home utilized Spanish-speaking radio and media to advertise its services. It also produced written advertisements and marketing materials in Spanish.

The loans originated by Your Home were originated in the name of Your Home Mortgage, LLC, and the Defendant was paid a commission, a draw, and profits by Your Home. Draws were distributed when income became available, and not according to a pre-determined schedule.

Commissions paid by Your Home were determined by the yield spread premium and origination fees for each loan.

The Defendant was paid a draw and profits by Su Casa. He also was paid a draw and profits by DMR.

Your Home Mortgage originated sub-prime loans, among other loans.

Some customers who were sold homes procured by Su Casa received

mortgages originated by Your Home.  Some customers who were sold homes procured by Su Casa and who received mortgages originated by Your Home also obtained property insurance through Osorno Insurance.

Your Home originated (among other loans) no documentation loans and low documentation loans. It originated (among other loans) loans with adjustable-rate mortgages, adjustable-rate mortgages with introductory teaser rates, no down payment loans, loans with balloon payments, loans with 40 year amortization periods, as well as two separate loans for an individual borrower.

B. The Individual Plaintiffs' Testimony

The Individual Plaintiffs testified at trial.  Mendoza, a native of El Salvador who has a third-grade education and neither speaks, reads, nor understands English, testified through an interpreter.  She indicated that she resided at 7 Glenwood Road, Somerville, Massachusetts and had done so for six years.  She further testified that she owns the property with her brother, Alvarez, and her son.

Mendoza testified that she was a machine operator at Ames Envelope, earning $24,000-$25,000 per year, when she purchased her home in Somerville.  She further testified that she had never purchased real estate until she acquired the Somerville property and did not understand mortgage transactions.  She is currently unemployed.

Mendoza related the circumstances surrounding the acquisition of her Somerville home.  She testified that she learned about Su Casa through Ortiz, who had worked at the Ames Envelope factory with her.  Ortiz, who was working at Your Home although Mendoza thought she was working at Su Casa, told Mendoza that she could help her buy a house, even though Mendoza had not contemplated buying a house and did not believe

that she had sufficient funds to do so.  Mendoza testified that she though Ortiz was her
friend, trusted her, and relied upon the information she provided.

Mendoza gave Ortiz information about her income, including pay stubs and tax
returns, as well as information about the amount of rent she paid for her apartment on Pearl
Street in Somerville where she was living with her son, her brother and her nephew, namely
$1,500 per month.  Ortiz, according to Mendoza, informed her that she would be required
to spend $3,000 "or a bit more" per month following her purchase of a two-family house.

Mendoza testified that Ortiz showed her five or six houses in the $300,000-$400,000
price range.  The house she purchased, however, cost in excess of $500,000.  When Mendoza
inquired as to whether she could afford the property, Ortiz told her "we would pay that
monthly and as time went by that it was going to go lower." In addition, Ortiz counseled
her and "said that he [Alverez] could give me his signature." Mendoza, who did not
contemplate buying the property with Alvarez, acquired title to the property with her
brother and her 24-year old son because Ortiz advised her that "the credit we have was not
enough."

After learning that her credit was insufficient to buy the house, Mendoza advised
Ortiz to stop looking for houses.  Ortiz, however, did not honor that request and Mendoza
eventually acquired the Glenwood Road property.  The closing occurred on March 30, 2006
at the law offices of Javier Pico ("Pico").  Mendoza had never met Pico before but believed
that he was going to be working with her and her family to acquire the house. Although the
closing took place at his law office, Mendoza did not meet Pico.  According to Mendoza, the

7

closing took 30-45 minutes and she was given documents to sign which were not translated into Spanish.  Ortiz attended the closing, but the documents were not explained to Mendoza, although following the closing Ortiz informed Mendoza that "we were going to pay more because our credit was not good." Ortiz told Mendoza not to worry, however, because in six months she could get a lower interest rate.

Mendoza testified that she paid approximately $6,000 prior to or at the closing, including a check to Bremis J. Realty, dated February 17, 2006 in the sum of $3,500; a check to MPIUA, dated March 30, 2006, in the sum of $1,081, and a check to Pico, dated March 30, 2006, in the sum of $1,970.   The HUD Settlement Statement, which was prepared by Pico, was submitted into evidence.  It shows a loan origination fee in the amount of $7,824 payable to Su Casa, plus other fees payable to Su Casa, including an appraisal fee ($475), a yield spread premium ($3,912), and a processing fee ($214).[1]  In addition, the Settlement Statement shows payments to Pico of $940, not $1,970.

Mendoza executed two notes in favor of New Century Mortgage Corporation, one in the sum of $391,200 and the other in the sum of $97,800 secured by first and second mortgages, respectively.  The note securing the first mortgage was an adjustable rate note with an introductory rate of 7.6%. It provided for a five-year "Interest-Only Period" during which the monthly mortgage payments would only apply to interest.  Mendoza did not understand that provision or information set forth in the Federal Truth-in-Lending

---

[1] Although Your Home was in the business of originating mortgages, the fees apparently were paid to Su Casa which was in the business of acting as a real estate broker.

Disclosure Statements. She testified that she could not afford the payments required under the loan documents. Mendoza also testified that Ortiz told her to obtain property insurance from Osorno Insurance.

Mendoza began have problems making her mortgage payments. Because Ortiz had indicated that she would help Mendoza obtain a lower interest rate after six months, Mendoza sought her assistance. Ortiz, however, "no longer wanted to help."

Mendoza testified that she was no longer working and was behind on her mortgage payments. She expressed concern about the loss of her house and indicated that her health has been jeopardized, stating "My nerves are destroyed. I cannot sleep because we don't have any money and now we're not going to have a house because we cannot afford to pay it."

Alvarez, Mendoza's brother, also testified through an interpreter. He indicated that he has a ninth grade education, and can speak and read a little English, although in 2006 when he bought the Glenwood Road property his facility with the English language was not as good as it was at the time of the trial. Alvarez testified that he did not intend to buy a house with his sister and did not realize he was doing so. He stated that "I was told that we were just putting my signature on the paper I would help her buy her house." When he acquired the Glenwood Road property, he was working at Ames Envelope as a machine operator, although he now works as a delivery driver. Alvarez testified that he put $4,000-$5,000 into the house before the closing by obtaining a loan from his 401k. He added that he withdrew an additional $4,500 after the closing to pay bills.

Like Mendoza, Alvarez believed Pico was representing them at the closing, and, like his sister, he did not understand the loan documents, which were neither translated nor explained.  He testified that he felt pressured into buying the house, particularly because Ortiz stated "we had to sign because otherwise we would lose all our money."  He added that he trusted Ortiz's representations that they could refinance and reduce their monthly mortgage payments.

Alvarez testified that he was able to obtain refinancing but had to pay more money to do so.  He indicated that he has been adversely affected by the transaction engineered by Ortiz.  He stated:

> For example, in the house Carmen and I have had arguments. Because we bought the house we are always arguing. I had my son and I had to pay child support. I had to cut a lot of things. My mother is also ill back home. It has affected in many ways I'm also sad about [sic].

Alvarez also testified that the family is behind in the mortgage payments.  Like his sister, he lost his job at Ames Envelope, although he is currently employed.

Rodrigues testified that she lives at 31 Michigan Avenue in Somerville with her daughter.  She stated that she was born in the Cape Verde Islands of West Africa and came to the United States in 1976.  Her native language is not English, but she testified that she can speak, read and understand English. She is currently unemployed because of numerous health issues.

At the time she purchased her house in Somerville, she did not understand mortgage transactions or interest rates.  She learned about Su Casa from Ortiz, whom she described

10

as a friend of a friend.  Rodrigues testified that although she had dreamed about buying a

house she did not think it was possible because she only worked part time due to disability.

Ortiz told her that she could afford to pay $2,000 to $2,500 monthly for a house, even though

she was living in public housing in Cambridge, Massachusetts at the time, paying $600 per

month in rent and only earning about $2,000 per month.  Rodrigues testified that Ortiz

transferred her financial information to Jaramillo and they advised her that she  could

obtain rental income to satisfy a mortgage obligation.  Jaramillo showed Rodrigues three

or four houses in the $450,000 to $500,000 price range.  She ended up buying a $485,000

house relying upon Jaramillo's representations that she could refinance the  mortgage in six

months so that the monthly mortgage payment would be affordable.

Rodrigues, like Mendoza and Alvarez, paid substantial sums prior to and at the

closing, including $500 "to take the house off the market;" $5,000 prior to the closing, and

$6,700 at the closing.  She obtained the monies from her savings.  In addition, she testified

that she signed a Uniform Residential Loan Application in blank.  An application, dated

July 14, 2006, reflected employment at Cambridge Hospital, although Rodrigues was not

working there, as well as base employment income of $2,385 and other income of $2,860,

totaling $5,245.  Rodrigues, in fact, held only a part-time job with Pacific Interpreters

earning $200 - $300 per month, not $1,600 per month. The application also set forth that her

race was "American Indian or Alaska Native." The interviewer's name on the application

was Nohora Ortiz and her employer was identified as Your Home.

Six days later, Rodrigues purportedly executed another application in the amount

11

of $388,000. It showed total monthly income of $9,220, including $7,960 from Pacific Interpreters, and other income of $1,260. Rodrigues described that income at trial as "[n]ot in this world" and stated that she did not recall seeing the application. A third Residential Loan Application for a mortgage in the amount of $97,000 was submitted into evidence, again showing Rodrigues's monthly earnings in the sum of $9,220.

Although Rodrigues thought Su Casa performed services for free, like Mendoza and Alvarez, she paid a substantial loan origination fee of $7,760 and a yield spread premium; total finance charges exceeded $15,000. Rodrigues did not understand those charges or that she was obtaining two loans. The loan closing took place in the offices of Pico, whom Rodrigues thought was her attorney. The documents were not explained to her and she was not given a meaningful opportunity to examine them. When she observed that the monthly payments exceeded the amounts that Ortiz and Jaramillo represented that she would be paying, she attempted to terminate the transaction. She stated that she was told she would lose all her money. Rodrigues ended up paying an annual percentage rate of 10.648% on an amount financed of $375,439.54 and annual percentage rate of 11.377% on an amount financed of $94,366.47. The larger loan was negatively amortizing and Rodrigues will owe $270,979.95 on September 1, 2036. In other words, she would be obligated to make a balloon payment of $270,979.95 on September 1, 2006.

About six months after the closing, Rodrigues began having problems making her mortgage payments. She testified that she is currently behind in her mortgage payments and is concerned about losing her home. In addition, she testified that although Jaramillo

told her that the Michigan Avenue property needed approximately $5,000 in repairs, it actually required repairs costing substantially more money.

C. The Debtor's Testimony

The Debtor was the last witness to testify.  He testified that he is a native of Columbia.  A high school graduate, he hoped to obtain a degree in finance from Boston College.  He took courses at the University of Massachusetts and had training as a mortgage loan originator.  Prior to forming the two limited liability companies that were defendants in the Suffolk Superior Court action, namely Your Home and Su Casa, with M. Osorno and Villamil, he obtained management experience and mortgage loan origination experience while working at Citiwide Mortgage Company, Inc. and at H & R Block Mortgage Corporation.  He currently works for Wells Fargo Bank.

In addition to his positions with Your Home and Su Casa, the Debtor testified that he was a partner or a principal in numerous corporations and companies.  The parties stipulated to the list of companies in which he had an ownership interest prior to the commencement of the case.

With respect to an entity identified as Your Home Realty, the Debtor indicated that the company was "in the business of helping consumers buy a property or sell a property." He added that "Your Home Mortgage  had a d/b/a for Su Casa Y Mas and Su Cas Y Mas, LLC had a d/b/a for Your Home Realty."

Your Home Mortgage, LLC, which was  formed on March 1, 2004 and organized under the laws of the Commonwealth of Massachusetts, had three members: the Debtor, M.

13

Osorno and Villamil.  They were also  denominated managers, although in the Certificate

of Organization filed with the Commonwealth of Massachusetts, the Debtor also was

identified as the Resident Agent.

The Debtor testified that he, M. Osorno, and his former brother in law, Villamil,

worked for Citiwide Mortgage Company, Inc., a mortgage company located in East Boston,

Massachusetts.  After doing mortgage originations for approximately one year, they

consulted an attorney about obtaining a mortgage brokerage license.  In furtherance of that

goal, they formed Your Home and opened a bank account in the name of Your Home which

they funded through capital contributions in the form of office equipment and cash, totaling

approximately $8,000-$10,000 apiece.

To obtain the mortgage brokerage license, the Debtor signed, on March 16, 2004, a

"Mortgage Lender and Mortgage Broker Initial Application Checklist" as a

Member/Manager of Your Home.  He also signed the Initial License Application as its

"duly authorized officer."  He listed himself as the individual responsible for responding

to all questions relating to the application, the person responsible for responding to

consumer complaints, the agent on whom lawful process could be served, and the contact

person for the inspection and examination of the applicant's books, records, accounts, and

documents.  In addition, he listed himself as the  senior officer of Your Home, identifying

himself as president and CEO in the box requiring the applicant to identify the "Name of

President/CEO." As part of the Application, the Debtor, M. Osorno, and Villamil were

required to submit financial statements and authorize the Division of Banks to access

14

"Criminal Record Information."   On or around May 18, 2005, less than six months after executing the application, Your Home obtained a license to engage in the mortgage brokerage business.  Its license indicated that it did business as Su Casa Y Mas.

Your Home arranged for residential and commercial mortgages for borrowers of all types.  It was paid commissions on mortgages it originated.  According to the Debtor, the company was paid a commission in two ways:  the yield spread premium and points paid by the borrower.  The commissions were deposited into the company's bank account upon receipt.  According to the Debtor, Su Casa earned money through the sale of real estate.  Deposits and commissions were put into its bank account and recorded by Villamil.

Although Villamil initially did the journal entries for Your Home, the Debtor's then spouse eventually undertook that responsibility until the couple's divorce.  Your Home used QuickBooks accounting software and the companies kept separate records.

The Debtor testified at his deposition, portions of which were read into the record, that he was the president of Your Home, managed its day-to-day business, and was in charge of quality control.  He indicated that he held weekly training sessions in the Chelsea office while M. Osorno conducted them in East Boston.  The training consisted of  teaching loan officers about banking guidelines and specific bank's loan programs, as well as "coach[ing] people on ethical and moral ways of doing business."  According to the Debtor, the companies brought in banking representatives and attorneys to inform loan officers about how to properly document loans.  In addition, he instructed employees on "how to deal with the customer and always put their interest -- customers' interests first."  He

testified that Your Home had between 15-20 employees, with the majority doing loan originations.  The Debtor indicated that Your Home employed two "processors" and a receptionist.  The loan officers were compensated through commissions only.

The Debtor testified that Ortiz was a loan officer at Your Home who attended training sessions both in Chelsea and East Boston and that Jaramillo, who was a broker, also was required to attend the training sessions. The Debtor admitted that Ortiz solicited customers on behalf of Your Home, interacted with and arranged loans for customers on behalf of Your Home, and earned money for Your Home based upon the loans she arranged. Ortiz operated under Your Home's mortgage broker license and solicited mortgage loans for the Individual Plaintiffs.  He testified, however, that he never authorized Ortiz to show any properties to any customers because she did not have a real estate sales license.  Indeed, he intimated that it would have been impossible for her to access the Multiple Listing Service to arrange showings without the appropriate license.

Su Casa Y Mas, LLC was formed on January 14, 2005.  The Debtor testified that at the time Su Casa was formed realtors did not know much about mortgage banking and he and his brother and brother-in-law thought that they would train them "the right way to help consumers with . . . a professionalism degree that we were giving our customers."  In its Certificate of Organization with the Commonwealth of Massachusetts, Villamil was listed as the Resident Agent.  According to the Debtor, in order for Su Casa to obtain a real estate sales and brokers license, the broker of record was required to have been working for a real estate company for one year.  Villamil was the broker of record.  Su Casa opened two bank

16

accounts, one for escrows and the other for operations.  According to the Debtor, the members deposited an unspecified amount of cash into the accounts when they were opened.  The members of Su Casa did not document the amount of contributions they may have made in addition to the cash deposits.

The Debtor, M. Osorno and Villamil were managers and members of Su Casa. Jaramillo was affiliated with Your Home Realty which was a d/b/a of Su Casa.  Jarmillo solicited customers on behalf of Su Casa and sold homes on its behalf.

The Debtor testified that if he needed money he would take it from the companies. Nevertheless, distributions from the companies when money was available required consensus.  The Debtor admitted that he received loans from Your Home in the form of advances against future commissions.  He could not recall, however, if all the loans were repaid, stating:  "It's my recollection that most of the loans that we would be taking out should have been paid back to the company and that would be taken care of by our bookkeeper on the transactions that we would be doing by the company."  In addition to making loans to its members, Your Home and Your Home Realty made loans to their employees against future commissions.

Your Home, Su Casa (or Your Home Realty) and DMR Properties, LLC ("DMR") shared office space and a telephone system, as well as some employees.  Your Home and Your Home Realty (Su Casa) paid rent to DMR in which the Debtor held a membership interest, although the rent to DMR was not paid on a regular basis.  The companies had fairly regular meetings, "at least twice per week during the time of 2004 and 2006," usually

on Tuesdays and Fridays, according to the Debtor.  The meetings were conducted at the

same time.  The Debtor testified that he was not able to produce the majority of the meeting

minutes.  Although he indicated Villamil recorded the minutes and emailed them to his

fellow members, he was neither able to produce them because of the passage of time nor

able to obtain copies from Villamil.  He explained that when Villamil ceased to be a member

in 2008 the minutes were corrupted and thus he could not produce any minutes after 2008.

The Plaintiffs submitted into evidence a Balance Sheet and a Profit and Loss

Statement for Your Home for the period from January to December 2005.  They did not

submit financial statements for Your Home for any subsequent years.  The 2005 Profit and

Loss Statement showed that Your Home had total income of $1,852,267.20 and incurred

expenses of $1,120,363.03, resulting in net income of $64,904.17.  Your Home categorized its

expenses.  Categories included, but were not limited to the following: appraisal expenses;

automobile expenses; bank service charges; charitable contributions; credit report expenses;

depreciation expenses; dues and subscriptions; equipment rental; insurance; licenses and

permits; marketing (which was broken into subcategories); partners benefits (broken into

subcategories); payroll expenses; commissions; FUTA expenses; other employee related

expenses (broken into subcategories); postage and delivery; printing and reproduction; rent;

repairs; office supplies; taxes; professional fees; office cleaning; telephone; training and

education; travel and entertainment/customer gifts; lodging; meals; travel; utilities; and

trash removal.

The ledger showed that Your Home spent $15,623.24 in travel and entertainment

18

expenses in August of 2005 with respect to a trip to "Six Flags" in Arizona.  The Debtor

testified, however, that the trip was for sales training , adding "[i]t was boot camp for three

days where they'd also be, you know, learning about business practice.  And the Six Flags

was to take the company - - the employees on an outing for . . . [a] good business quarter."

In addition, the company acquired a $70,000 Hummer.  The Debtor explained that

the vehicle was acquired after receipt of tax advice from the company's accountant, and it

was used for marketing purposes and taking customers to closings and showings.  He

testified that he did not use it personally.  Additionally, the Debtor and the other members

of Your Home and Su Casa made charitable contributions to provide a soccer field for

young children and scholarship funds for top Latino students.

The Plaintiffs did not introduce into evidence a Profit and Loss Statement for Su Casa

for 2005.  The only financial information submitted with respect to Su Casa was a Profit and

Loss Statement for 2009, the year in which it filed a Certificate of Cancellation with the

Commonwealth of Massachusetts.  In that year, the Debtor used Su Casa funds to travel to

Peru, Equador and Columbia, although the Debtor maintained that Your Home Realty was

looking for land and real estate sales to be offered to buyers in the United States.

The Profit and Loss Statement for Su Casa (or Your Home Realty) also showed

questionable payments such as those to Wachusett Park, Loon Mountain and numerous

restaurants.  In addition, the Debtor engaged in on-line day trading and caused Su Casa to

spend $13,030 between April 1, 2009 and July 1, 2009.  The Debtor indicated that although

he caused Su Casa to expend the funds, he shared the profits from his day-trading with M.

19

Osorno. The Debtor also admitted that he may have used company credit cards for personal expenses "once or twice." Although both Your Home and Su Casa were dissolved in 2009, the Profit and Loss ledger for Su Casa showed questionable payments during that year.

The Debtor testified that he did not analyze how many of the sales made by Your Home Realty resulted in some type of foreclosure activity, although he stated that he had heard on the news that nearly 50% were involved. The Debtor explained that a customer without a job applying for a "no documentation" loan could get such a loan if he had family or friends living with him willing to assume responsibility for repayment of the loan.

The Debtor testified that Your Home borrowed $50,000 from Metro Credit Union for working capital. The note was co-signed by DMR and guaranteed by the members of Your Home. He also testified that both Your Home and Su Casa paid their bills as they came due in 2006. In addition, according to the Debtor, the companies filed annual reports with the Secretary of State for the Commonwealth of Massachusetts for 2005 and 2006, as well as a Certificate of Amendment for Su Casa to allow for real estate brokerage of commercial properties as well as residential properties.

In 2008, the Debtor, who had been residing in Georgia exploring real estate ventures there, returned to Massachusetts. He testified that he found that at that time both Your Home and Su Casa were thinly capitalized and the mortgage banking industry was deteriorating. The Debtor and M. Osorno had to contribute money to see that bills were paid, particularly as Your Home was not closing very many mortgage transactions in 2008 and 2009 and Su Casa was not involved in many sales. Eventually, the two companies were

20

dissolved, although some bank accounts remained open in their names.  The Debtor

testified that he listed the names of the two limited liability companies on his bankruptcy

petition because of the open bank accounts.  He testified that he never personally used the

names Your Home Mortgage or Su Casa Y Mas.

The Debtor also testified that he never met either Mendoza or Alvarez before their

closing on March 30, 2006.  He also testified that he never met Rodrigues before her closing

on August 1, 2006.

The Debtor was asked about the Individual Plaintiffs' testimony, in particular

Rodrigues's testimony that she signed a document in blank.  He testified that it would have

been impossible for Rodrigues to sign a Uniform Residential Loan Application in blank,

explaining that, unless the application was handwritten, it could not be executed and then

completed on the computer.  Nevertheless, he admitted that he likely was not present when

she signed the application and thus could not state precisely what happened.

With respect to the conduct of Ortiz in showing Mendoza properties, the Debtor

repeated that the policies of the companies did not permit Ortiz to show real estate to

prospective buyers as she was neither a broker nor a licensed real estate agent.  He

explained:

> . . . no realtor would allow somebody who calls her out of the blue to say,
> you know, I want to show this property, can --you know, can I go and show
> it to the customer because this realtor needs to have what's called their user
> ID, which is a BB number that is issued by the MLS, Massachusetts Listing
> System [sic].

The Debtor added that Ortiz never asked permission to show real estate and had she done

21

so he would have refused permission.

## III. SHOULD THE DEBTS OF YOUR HOME AND SU CASA BE IMPUTED TO THE DEBTOR?

A. Applicable Law

To sustain their burden of proof under 11 U.S.C. § 523(a)(2)(A), (a)(4) and (a)(6), the Plaintiffs must not only satisfy the requisite elements of each of their claims under Counts I through III of their Amended Complaint, they must demonstrate, as a prerequisite, that the Debtor is liable for the debts of Your Home and Su Casa because he was the alter ego of those entities.  This is particularly important because the Plaintiffs submitted no evidence that the Debtor had any contact with them prior to or at the closings when they acquired their properties in Somerville and executed mortgage loans.

Under certain circumstances, the Bankruptcy Court may pierce the corporate veil to hold corporate officers personally liable for the debts of the corporation. In Riley v. Tencara, LLC (In re Wolverine, Proctor & Schwartz, LLC), 447 B.R. 1 (Bankr. D. Mass. 2011), this Court observed that, "[a]lthough the standards for piercing the corporate veil are articulated most frequently with respect to corporations, this Court concludes that the same principles would apply for alter ego liability to attach to members of limited liability companies." Id. at 36 (citing In re Giampietro, 317 B.R. 841, 847–48 and n.9 (Bankr. D. Nev. 2004)).  Thus, under Massachusetts law, for this Court to consider the Debtor as the alter ego of Your Home or Su Casa, it would have to conclude that the limited liability companies through which he operated failed to observe appropriate formalities and simply functioned as a

facade or alter ego of their members. With respect to those formalities, this Court stated:

> Massachusetts courts have signaled the importance of observing corporate formalities and by extension those relating to limited liability companies. In Zimmerman v. Puccio, 613 F.3d 60 (1st Cir. 2010), the United States Court of Appeals for the First Circuit observed:
>
>> [W]e tread carefully when determining whether it is appropriate to put aside the basic tenet of corporate law that "corporations—notwithstanding relationships between or among them—ordinarily are regarded as separate and distinct entities," Scott v. NG U.S. 1, Inc., 450 Mass. 760, 881 N.E.2d 1125, 1131 (2008), and thereby to "allow a plaintiff to pierce the corporate veil of limited liability." In re Ontos, Inc., 478 F.3d 427, 432 (1st Cir. 2007). In Massachusetts, "the corporate veil will only be pierced in rare situations." Birbara v. Locke, 99 F.3d 1233, 1239 (1st Cir. 1996). Such situations do occur, however, and Massachusetts has recognized that it is the "right and the duty of courts to look beyond the corporate forms" when necessary "for the defeat of fraud or wrong, or the remedying of injustice." Hanson v. Bradley, 298 Mass. 371, 10 N.E.2d 259, 264 (1937) (quoted in Scott, 881 N.E.2d at 1132).
>
> Massachusetts has identified as relevant to the veil-piercing analysis a set of twelve factors. They are: "(1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud." Att'y Gen. v. M.C.K., Inc., 432 Mass. 546, 736 N.E.2d 373, 381 n. 19 (2000).
>
> Zimmerman v. Puccio, 613 F.3d at 73–74 (footnotes omitted). *See also* My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 233 N.E.2d 748, 751–52 (1968).

In re Wolverine, Proctor & Schwartz, LLC, 447 B.R. at 35-36.

B. Positions of the Parties

Both the Plaintiffs and the Debtor recognize the applicability of the 12-factor test employed by state and federal courts in Massachusetts.  In applying the factors to the facts adduced at trial they reach different conclusions.

1. Common Ownership

The Plaintiffs cite the Debtor's status as the founder, owner, and manager of both Your Home and Su Casa, as well as his affiliation with other interrelated companies including Osorno Insurance, LLC and DMR Properties, LLC.  In support of their veil piercing argument, they point to the practices of sharing office space and conducting joint meetings of the members/managers for both Your Home and Su Casa resulting in preparing joint minutes of meetings, employing individuals that worked for more than one company, and making loans to members and employees.

The Debtor counters that he was only one of three members/managers and all decisions with respect to Your Home and Su Casa had to be unanimous.  He maintains that common ownership and common management, standing alone, are insufficient to establish alter ego liability.

2. Pervasive Control

The Plaintiffs rely upon the Debtor's status as the day-to-day operations manager of Your Home and his role in conducting regular training sessions for employees of both Your Home and Su Casa as further support for piercing the veils of the limited liability companies.  They also point to his reference to himself as President/Manager of Your Home on its Initial License Application to conduct business as a mortgage broker, as well as his

24

statement in the application that he was the main contact person.  In addition, they contend that he acted as the main person in control because of his experience as a mortgage broker, which they assert greatly exceed the experience of the other two members.   The Plaintiffs conclude he "exercised pervasive control over both Your Home and Su Casa."

The Debtor contends that he was one of three member/managers of Your Home and Su Casa and decisions among them had to be unanimous.  In addition, he asserts that the companies continued to operate without his daily presence when he moved from Massachusetts to explore opportunities in Georgia.

### 3. Confused Intermingling

The Plaintiffs maintain that there was clear intermingling of the activities and operations of Your Home and Su Casa, contending that "[t]he line between the companies is murky at best" because they shared the same members and managers and were affiliated with other entities.  Because Su Casa was the real estate arm of the businesses, selling homes to customers, and Your Home was the mortgage brokerage arm of the business, arranging mortgages for borrowers, the companies often served the same people.  In the Plaintiffs' view, the interchangeable names used by the company, i.e., Your Home Mortgage, LLC's d/b/a/ was Su Casa Y Mas, and Su Casa Y Mas, LLC's  d/b/a was Your Home Realty, could have no effect other than to confuse consumers who often did not know the identity of the company with which they were dealing, particularly as the companies shared office space, phones and computer systems.  The Plaintiffs also argue that the principal members of Your Home and Su Casa were related by blood or marriage and several employees

25

worked for both companies, thus establishing "substantial and persistent intermingling."

In contrast, the Debtor maintains there was no confused intermingling.  He focuses on the lack of intermingling of business assets, while recognizing that the limited liability companies owned a Toyota Yaris  and a Hummer.  He asserts that the Hummer was used for business, while he was authorized by the limited liability companies (he did not differentiate among them) to use the Yaris.  He also admits to having a cell phone provided by and paid for by the limited liability companies which he occasionally used for personal business and to having company credit cards which he used for personal expenses once or twice.  According to the Debtor, other expenses such as those incurred at Six Flags and Loon Mountain were for legitimate business purposes, namely employee training and recognition.  In any event, he notes that those activities occurred in 2009, well after the conduct about which the Plaintiffs complain.  He also argues that the evidence established that  any loans he may have obtained from the limited liability companies were repaid.

### 4. Thin Capitalization

The Plaintiffs argue that Your Home and Su Casa were thinly capitalized because neither had a line of credit or outside investors.  They maintain that there was no written evidence to support the Debtor's testimony that each member contributed approximately $9,000 to Your Home in the form of office equipment and cash.  They infer that company loans to employees establish a lack of adequate capitalization and point to the Debtor's admission that in 2008 the companies were, in fact, thinly capitalized, although they continued to spend money on trips for employees and restaurants.

The Debtor counters that Your Home and Su Casa paid their bills on time and the only evidence as to capitalization was his unrebutted testimony that each member of each limited liability company contributed approximately $9,000 in equipment and cash.

### 5. Nonobservance of Corporate Formalities and the Absence of Records

While recognizing that Your Home and Su Casa filed certificates of organization, engaged counsel to prepare limited liability agreements and kept some financial records, they argue that the companies "repeatedly ignored numerous corporate formalities and failed to adhere to the strict roles of corporate structure." They contend that Su Casa did not properly document the initial capital contributions of the members and that the companies held joint membership meetings and reported meetings in joint minutes, adding that they failed to keep copies of minutes. Indeed, the Plaintiffs intimate that the meetings may not have been held. In short, because the companies were operated informally with no set salaries, no set meeting times, and no set policies as to when the members could withdraw money, they contend that they established the nonobservance of corporate formalities.

In addition, the Plaintiffs point to an absence of business records and cite the Debtor's testimony that "[i]t was the responsibility of the bookkeeper . . . to record all transactions pertaining to the LLCs." They also note the Debtor's inability to produce more than minutes for a few meetings, while asserting that Villamil who was responsible for keeping those records emailed them to the other members. The Plaintiffs maintain that because Villamil emailed the minutes to his fellow members, the Debtor should have been

able to produce copies of the minutes.

The Debtor points to his testimony that the members of Your Home and Su Casa held regular meetings on Tuesdays and Fridays.  Although he admitted he was unable to produce minutes, he argues that the reason was because they were in the possession of Villamil from whom he is estranged.  Moreover, the Debtor states that he submitted corporate records as exhibits, including Certificates of Organization and Limited Liability Company Agreements.

### 6. No Payment of Dividends

Your Home and Su Casa were limited liability companies.  Because of their organization, they would not pay dividends.  Rather, profits would be disbursed through distributions and taxes in the same manner as partnership income.  The Plaintiffs argue that distributions were not made regularly.  The Debtor points to his testimony that the members reported profits from the business on K-1 tax returns.

### 7. Insolvency

The Plaintiffs recognize that Your Home and Su Casa began experiencing financial problems in 2008.  Indeed, they note that the Debtor testified that he and other members were required to contribute their own funds to pay obligations of the limited liability companies.

The Debtor argues that during 2006, the time period when the transactions at issue took place, Your Home and Su Casa were paying their bills as they came due and no evidence was presented that they were insolvent on a balance sheet basis or incapable of

28

paying their bills as they came due during 2006.

### 8. Siphoning Away Assets

The Plaintiffs maintain that there was  a wrongful diversion of assets while the companies were in financial distress, citing numerous personal and frivolous expenses for meals, entertainment, employee trips, luxury cars and international travel.  They note that Your Home acquired a $70,000 Hummer and that the Debtor used funds belonging to Su Casa in 2009 to pay for a $13,030 fee for a course in how to make money day trading stocks.

Although the Debtor admitted using the Yaris automobile and occasionally using a company credit card, he maintains there was no evidence that he systematically siphoned assets of Your Home or Su Casa for his personal benefit.

### 9. Non-functioning Officers and Directors

The Plaintiffs argue that the members of Su Casa and Your Home "functioned merely as paid family members" and that "[f]rom formation until 2007, the ownership interests in both companies were equally divided amongst the Debtor, his brother Mauricio Osorno, and his brother-in-law Ricardo Villamil."  After 2007, because the Debtor separated from his spouse, Villamil's ownership interest in both companies was extinguished.  They also rely on the Debtor's testimony that the corporate titles were just formalities, concluding that "given the close family relations, the lack of evidence of board meetings and records of minutes, it can be inferred the officers and director did not function as such."

The Debtor, however, argues that his testimony established that he, M. Osorno and Villamil were functioning managers and that the three equal owners of Your Home and Su

Casa had to be in total agreement before decisions were made.  He also notes that corporate

titles are irrelevant and do not apply to limited liability companies.

10. Use of the Companies for Transaction of the Dominant Member

Although limited liability companies do not have shareholders, the Plaintiffs assert

that the Debtor repeatedly used Su Casa and Your Home for his own personal interests and

activities, "many of which went beyond 'any reasonable business usage.'"  They point to

the $13,030 spent by Su Casa for the Debtor to attend the Online Day Trading Academy

which enabled the Debtor to make over $93,000 in 2009.  In addition, the Plaintiffs rely upon

the Debtor's use of Su Casa's funds to pay for travel in Peru, Equador, and Columbia, as

well as trips to Loon Mountain, Wachusett Mountain Ski Area and the Arlington Theatre.

They add that the Debtor also used the companies "as piggy banks for his own personal

expenses," resulting in payments by the limited liability companies for his cell phone,

Massachusetts General Hospital parking fees, pediatric bills, numerous restaurant and

household expenses, charitable contributions to children's soccer teams, sports equipment

at Sports Authority, and New Balance shoes.  They add that he used company credit cards

for personal expenses and took loans from the company, not to mention use of the Yaris

automobile.

The Debtor contends that there was no evidence that Your Home and Su Casa were

used for transactions for the benefit of their members.  He states that he did not use the

names of the companies for personal purposes and he established that the trip to South

America was for business, as were the trips to New Hampshire and Arizona.  In his view,

except in a few instances, all expenditures had a legitimate business purpose, including the

South American trip which was to explore business opportunities.

11. Use of the Corporation in Promoting Fraud

The Plaintiffs argue that Su Casa and Your Home Mortgage were formed "with the

purpose of targeting and placing low-income, limited-English speaking Latinos into homes

with high cost mortgages they were unable to afford." They note that when the Debtor was

asked at his deposition, which was read into the record, whether mortgage brokers are

allowed to offer borrowers loans that they know the borrowers cannot afford, the Debtor

responded with an unequivocal "absolutely," although such loans are illegal in

Massachusetts.[2] The Plaintiffs also state that "an astounding fifty percent of the loans

---

[2] The colloquy that occurred between the Debtor and Plaintiffs' counsel at trial is
as follows:

    Q. And are mortgage brokers allowed to offer loans to borrowers that they
    know that they cannot afford?
    A. No.
    Q. What's that?
    A. They're not allowed to give -- I -- it is my -- you  mean now or you mean
    before, back in the days?
    Q. Well, at the time you were in business.
    A. Can you repeat the question one more time?
    Q. Are mortgage brokers allowed to offer borrowers loans that they know
    the borrowers cannot afford?
    A. All right. No, we're not allowed to do that.
    Q. And one minute. I think you recall that you came into my office and
    were given -- or gave a deposition, is that correct?
    A. Yes.
    Q. I'd like to show you page 186 of the deposition.  And could you read
    what it says starting -- I'm sorry, that's on line 11, question, "As a
    mortgage broker ..."?
    A. "Q. As a mortgage broker, are you allowed to offer loans that you know

31

brokered by the Debtor's companies resulted in foreclosure,"[3] and Your Home and Su Casa, and by extension the Debtor, made money from clients up-front and thus were unaffected when clients defaulted on their mortgage loans.[4]  The Plaintiffs add that clients were promised that the companies would assist with refinancing after six months, but  they and by extension others received no assistance to do so.  In the Plaintiffs' view,  Su Casa and Your Home were set up and operated with the purpose of effectuating fraud.

The Debtor maintains that there was no evidence presented that he used Your Home or Su Casa to promote fraud. He asserts that the companies conducted legitimate, ongoing

---

customers can't afford?
A. Well, I'm not a mortgage broker anymore. No. But in general a mortgage broker is permitted to offer loans that they know the borrowers cannot afford, absolutely."
Q. So when I asked you that question in November 15, 2011, you told me that absolutely mortgage brokers can offer loans that borrowers can't afford.
A. I may have understood the answer in the wrong way because when we had a borrower come in, apply for a loan that was . . .[no doc] . . . loan without a job, then there was a loan being offered by a bank that did not needed a job to be able to – for this borrower to be had, but he had his family or friends who were -- who would be living with him to apply for the loan.  So even though he did not qualify for the loan, he -- the program guidelines existed for him to be able to get a loan.
Q. But if someone didn't have family members who would buy the house with them you thought they still could qualify for a loan?
A. If they cannot afford to make the mortgage payment, then, no.

[3] The Court notes that the Debtor testified that he heard on the news that "nearly 50% of the residential sales made by Su Casa had been involved in some kind of foreclosure action."  The Plaintiffs did not submit the analysis of the loans into evidence.

[4] On the Mendoza/Alvarez loan, Your Home received a loan origination fee of $7,824 and another fee of $3,912 for a Yield Spread Premium.  On the Rodrigues loan, Your Home collected a $4,753 origination fee.

businesses and maintained the requisite licenses with the Commonwealth of Massachusetts.

He notes that he conducted regular training of employees in proper mortgage

documentation and loan origination. Significantly, he asserts that he was not present when

the transactions at issue in this case took place and that to the extent Ortiz or Jaramillo

undertook questionable practices, the policies of Your Home and Su Casa did not permit

those actions.

C. Analysis

Neither Your Home or Su Casa answered the Individual Plaintiffs' Complaint filed

in the Suffolk Superior Court in which they alleged that the mortgage loan transactions

engineered by Your Home and Su Casa were predatory, as the mortgage loans contained

onerous terms and required the payment of excess and unfair fees, including yield spread

premiums.[5]  A review of the loan documents submitted into evidence by the Plaintiffs

establishes that the Individual Plaintiffs, whose sources of income were, as their testimony

established, circumscribed by factory jobs, lack of education, and language skills, did not

have sufficient income to make the monthly mortgage payments required under the terms

of the notes secured by the mortgages on the properties they acquired in Somerville,

---

[5] In Darden v. Noyes, 24 Mass. L. Rptr 448, 2010 WL 4456992 at *1 n. 3 (Mass. Super. Aug. 13, 2010), the court stated: "'Yield spread premiums are payments made by lending institutions to mortgage brokers based on the rate of interest charged on a borrower's loan. The higher the interest rate, the larger the yield spread premium payment.'" (quoting  Howell E. Jackson & Laurie Burlingame, *Kickbacks or Compensation: The Case of Yield Spread Premiums*, 12 Stan.J.L.Bus. & Fin. 289, 289 (2007)).  *See also* Commonwealth v. Fremont Inv. & Loan, 452 Mass. 733, 736 n.8 (2008).

particularly as the loans contained adjustable interest rates. The Debtor did not dispute that the Individual Plaintiffs were sold homes procured by Su Casa and obtained mortgages originated by Your Home. He also did not dispute that Your Home originated no documentation and low documentation loans with adjustable-rate mortgages, including ones with introductory teaser rates, no down payment loans, and loans requiring balloon payments. There was no evidence, however, of the total number of loan transactions for 2006 or any other years, or the total number of loans which would be considered predatory.

Although the Individual Plaintiffs submitted compelling evidence as to the unfairness of the transactions pursuant to which they acquired their homes in Somerville, they did not call any witnesses other than the Debtor to testify about the business practices of Your Home and Su Casa. For example, they did not seek testimony from M. Osorno, Villamil, Ortiz, Jaramillo, or any former employees of Your Home or Su Casa. No witnesses testified that the conduct of Ortiz and Jaramillo was part of the business plan of Your Home and Su Casa to broker high cost loans and sell properties to those who could least afford them. As a result, the Debtor's testimony that he conducted regular training sessions for the employees of Your Home and Su Casa and did not authorize Ortiz to engage in the conduct described by the Individual Plaintiffs was unchallenged. This Court lacks evidence that would permit it to find that Ortiz and Jaramillo were not rogue employees acting on their own behalf to generate commissions because they were not paid regular salaries.

While the Plaintiffs established that the focus of the business of Your Home and Su Casa was the Latino and Spanish-speaking community, as noted above, they did not submit

probative evidence as to the number of loans originated by Your Home, the number of predatory loans in relation to conventional loans, or the number of loans that have been the subject of foreclosure actions. A passing reference in cross-examination to an unauthenticated analysis and a possible news story to establish that there was a 50% default rate with respect to Your Home's loans resulting in foreclosure actions is insufficient to establish the Debtor's liability to the Individual Plaintiffs for the predatory loans they obtained in the absence of additional evidence.

In their Joint Pretrial Memorandum, the parties agreed that Your Home utilized Spanish-speaking radio and media to advertise its services, as well as written advertisements and marketing materials. Examples of these marketing efforts were not introduced into evidence so it is impossible to infer that they were misleading. Moreover, this Court cannot infer from the existing record that all the Latinos and Spanish-speakers who did business with Your Home or Su Casa obtained only subprime mortgage loans.

Although the Individual Plaintiffs were confused about the relationship between Your Home and Su Casa, the parties agreed that those entities provided customers with an "Affiliated Business Arrangement Disclosure Statement." The Individual Plaintiffs did not testify that they did not receive that Statement.

The loan originators at Your Home were paid on a commission basis. Because the Debtor testified that Ortiz was not authorized to engage in the sale of real estate and was not authorized to show properties, it was incumbent upon the Plaintiffs to establish that she was acting with the authority of the Debtor. On the basis of the existing record, this Court

35

has no evidence that would suggest that the Debtor was lying under oath. Without testimony from Ortiz, this Court accepts the Debtor's testimony that she was not authorized to show real properties to Mendoza.

Upon consideration of the twelve factors set forth in decisions, including In re Wolverine Proctor & Schwartz, LLC, 447 B.R. at 35-36, and Att'y Gen. v. M.C.K., Inc., 736 N.E.2d at 381 n.1; the facts adduced at trial; and the arguments made by the parties in their post-trial briefs summarized above, the Court finds that the Plaintiffs failed to sustain their burden of establishing that the Debtor was the alter ego of either Your Home or Su Casa. Although there was common ownership of Your Home and Su Casa, the Plaintiffs failed to establish that Your Home and Su Casa failed to maintain separate books and records or that the Debtor was the dominant member or manager of either entity in 2006 at the time of the transactions at issue. Indeed, both Your Home and Su Casa had detailed Limited Liability Agreements and each filed Certificates of Organization with the Secretary of the Commonwealth. The Debtor unequivocally testified that decisions among the members required consensus and, as a result, he did not and could not exercise pervasive control over either entity. In addition, Your Home and Su Casa would appear to have kept detailed records of all their expenditures. The Profit and Loss Statements for Your Home for the year 2005 and the Profit and Loss Statement of Su Casa for the year 2009 accounted for all business expenses, including ones that the Plaintiffs have pointed to as questionable.

The Court also finds that the Plaintiffs failed to establish that either entity was thinly capitalized or insolvent at the time of the transaction at issue in 2006. Your Home had

substantial income in 2005 and reported net income of approximately $60,000. Although

both entities failed to prosper with the onset of trouble in the housing market, the evidence

of thin capitalization was scant at best. Although the Plaintiffs attempted to establish that

Your Home and Su Casa ignored the formalities incident to limited liability companies, the

Court finds the Debtor's testimony as to biweekly meetings of the member/managers to be

credible. Although the businesses were family businesses in the sense that the members

were related by blood or marriage and their close relationship spilled over into the

management of Your Home and Su Casa, that alone is insufficient to warrant piercing the

veil of the limited liability companies. The Court has no reason to believe that the Debtor,

M. Osorno and Villamil did not meet to go over business matters twice a week. The Court

has no evidence that the Debtor dominated the other members.

Although some of the expenditures made by Your Home and Su Casa can be

questioned with hindsight, the Debtor provided an explanation for most of the

expenditures for travel, entertainment, and charity. While the Plaintiffs point to charitable

contributions, the Court takes judicial notice that many corporations make contributions

that benefit the communities in which they conduct business. That is not a ground for

finding the Debtor to be the alter ego of the limited liability companies in which he held

membership interests. Similarly, the Debtor provided an explanation for the acquisition of

the Hummer. With respect to the Yaris, the Court observes that the use of company cars by

small business owners is common and, without more, cannot establish grounds for piercing

the veil of the limited liability companies.

37

## IV. ARE THE PLAINTIFFS' JUDGMENTS NONDISCHARGEABLE?

Having found that the Debtor is not the alter ego of either Your Home or Su Casa,

the Court need not analyze the evidence in relation to the elements of causes of action under

11 U.S.C. § 523(a)(2)(A), (a)(4) and (a)(6).   It is sufficient to observe that there was no

evidence that the would permit this Court to conclude that a fiduciary relationship existed

between the Debtor and the Individual Plaintiffs.  *See generally* Lacourse Builders, LLC v.

D'Anello (In re D'Anello), __ B.R. __, 2012 WL 3249504 at *8 (Bankr. D. Mass. Aug. 7,

2012)(citing Petrucelli v. D'Abrosca (In re D'Abrosca), No. 09–01070–ANV, 2011 WL 4592338

(B.A.P. 1st Cir. Aug. 10, 2011)).[6]

---

[6] In D'Anello, this court stated:

A fiduciary relationship exists when there is an express or technical trust.
*See* [Rutanen v. Baylis (] In re Baylis[)], 313 F.3d [9] at 17 [ (1st Cir. 2002) ].
A trust imposed by law due to malfeasance would not constitute a trust in
this context. Mullen v. Jones (In re Jones), 445 B.R. 677, 707 (Bankr. N.D.
Tex. 2011). Moreover, the "broad definition of fiduciary under
nonbankruptcy law—a relationship involving trust, confidence, and good
faith-is inapplicable in the dischargeability context." Honkanen v. Hopper
(In re Honkanen), 446 B.R. 373, 378–79 (B.A.P. 9th Cir.2011) (citing
Cal–Micro, Inc. v. Cantrell (In re Cantrell), 329 F.3d 1119, 1125 (9th Cir.
2003)). Neither party suggest an express trust existed in this case.

A technical trust is one that arises under statute or common law. See Farley
v. Romano (In re Romano), 353 B.R. 738 (Bankr. D. Mass. 2006) (citing M–R
Sullivan Mfg. Co., Inc. v. Sullivan (In re Sullivan), 217 B.R. 670, 674 (Bankr.
D. Mass. 1998)); Collenge v. Runge (In re Runge), 226 B.R. 298, 305
(Bankr.D.N.H.1998). State law is relevant in considering whether such a
trust exists. *See* A .J. Rinella & Co. v. Bartlett (In re Bartlett), 397 B.R. 610,
620 (Bankr. D. Mass. 2008); LaPointe v. Brown (In re Brown), 131 B.R. 900,
905 (Bankr. D. Me. 1991) ("one must ... ascertain whether the relationship

Similarly, the Plaintiffs failed to adduce any evidence that would support a claim

under 11 U.S.C. § 523(a)(6), which requires proof of a willful and malicious injury. *See*

*generally* Liddell v Peckham (In re Peckham), 442 B.R. 62 (Bankr. D. Mass. 2010); Farley v.

Romano (In re Romano), 385 B.R. 12, 30 (Bankr. D. Mass. 2008).[7]  In other words, there is no

evidence that either the Debtor or the limited liability companies intended a deliberate or

---

was imbued with attributes giving rise to, in substance, a trust"). A state
law fiduciary relationship may not rise to the level of 11 U.S.C. § 523(a)(4)
unless "state law imposes the duties of a trustee on a party." McDowell v.
Stein, 415 B.R. 584, 595 (S.D. Fla. 2009); *see also* Fowler & Peth, Inc. v. Regan
(In re Regan), 477 F.3d 1209, 1211 (10th Cir.2007).

In re D'Anello, 2012 WL 3249504 at *8 (quoting In re D'Abrosca, 2011 WL 4592338 at *5.

[7] In In re Romano, this Court stated:

To sustain its burden of proof under the preponderance of the evidence
standard, a creditor must establish "that 1) the debtor's conduct was
willful and malicious, 2) the creditor suffered an injury to its legal rights,
and 3) the creditor''s loss was caused by the debtor's conduct." *See* CMEA
Title Agency, Inc. v. Little (In re Little), 335 B.R. 376, 383 (Bankr. N.D. Ohio
2005)(citing, inter alia, Jones v. Svreck (In re Jones), 300 B.R. 133, 139 (1st
Cir. BAP 2003)). *See also* Beland v. Cunningham (In re Cunningham), 365
B.R. 352, 359–60 (Bankr. D. Mass. 2007). "Although relevant state laws may
be instructive, 'what constitutes 'willful and malicious injury' under §
523(a)(6) is a matter of federal law.'" Little, 335 B.R. at 383 (citing Baldwin
v. Kilpatrick (In re Baldwin), 249 F.3d 912, 917 (9th Cir.2001), and Kleman
v. Taylor (In re Taylor), 322 B.R. 306, 309 (Bankr. N.D. Ohio 2004)). For a
debt to be excepted from discharge as a result of a willful or malicious
injury requires "a deliberate or intentional injury, not merely a deliberate
or intentional act that leads to injury." Kawaauhau v. Geiger, 523 U.S. 57,
61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). "The word 'willful' in [§ 523](a)(6)
modifies the word 'injury,' indicating that nondischargeability takes a
deliberate or intentional injury, not merely a deliberate or intentional act
that leads to injury." Id.

39

intentional injury to the Individual Plaintiffs, as opposed to deliberate or intentional acts that lead to injury.

Finally, the Court finds that the Plaintiffs cannot and did not sustain their burden under 11 U.S.C. § 523(a)(2)(A).  In the absence of evidence that the Debtor even met the Individual Plaintiffs before their closings, they cannot establish the requisite elements of a claim under 11 U.S.C. § 423(a)(2)(A). *See* <u>Zhao v. Lauzon (In re Lauzon)</u>, No. 10-1114, 2012 WL 1192800 (Bankr. D. Mass. April 9, 2012).[8]   They failed to establish

---

[8] In <u>Lauzon</u>, this Court observed:

Section 523(a)(2)(A) excepts from discharge a debt of an individual debtor "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). The plaintiff must establish that the debt is excepted from discharge by a preponderance of the evidence. *See* <u>Grogan v. Garner</u>, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

In <u>Blacksmith Invs., LLC v. Woodford (In re Woodford)</u>, 403 B.R. 177 (Bankr.D. Mass.2009), *aff'd*, 418 B.R. 644 (B.A.P. 1st Cir. 2009), this Court stated:

> The United States Court of Appeals for the First Circuit has addressed issues under section 523(a)(2)(A) on multiple occasions, observing that, as with all exceptions to discharge under section 523(a), they are "narrowly construed . .. and the claimant must show that its claim comes squarely within an exception enumerated in Bankruptcy Code § 523(a)." <u>McCrory v. Spigel (In re Spigel)</u>, 260 F.3d 27, 32 (1st Cir.2001) (citing <u>Century 21 Balfour Real Estate v. Menna (In re Menna)</u>, 16 F.3d 7, 9 (1st Cir.1994)). In <u>Spigel</u>, the First Circuit, while noting that the Supreme Court overruled its formulation of the reliance element of the test for nondischargeability under section 523(a)(2)(A), articulated

that the Debtor directed Ortiz and Jaramillo to mislead and defraud creditors or that some

---

the following requirements for establishing an exception to discharge under section 523(a)(2)(A):

> [W]e have said that the statutory language does not "remotely suggest that nondischargeability attaches to any claim other than one which arises as a direct result of the debtor's misrepresentations or malice." Century 21 Balfour Real Estate, 16 F.3d at 10. Thus, in order to establish that a debt is nondischargeable because obtained by "false pretenses, a false representation, or actual fraud," we have held that a creditor must show that 1) the debtor made a knowingly false representation or one made in reckless disregard of the truth, 2) the debtor intended to deceive, 3) the debtor intended to induce the creditor to rely upon the false statement, 4) the creditor actually relied upon the misrepresentation, 5) the creditor's reliance was justifiable, and 6) the reliance upon the false statement caused damage. Palmacci v. Umpierrez, 121 F.3d 781, 786 (1st Cir.1997). Though the first two elements of the Palmacci test describe the conduct and scienter required to show fraudulent conduct generally, the last four embody the requirement that the claim of the creditor arguing nondischargeability in an adversary proceeding must arise as a direct result of the debtor's fraud.

Spigel, 260 F.3d at 32 (footnotes omitted).

In re Woodford, 403 B.R. at 183–84 (footnote omitted). *See also* Liddell v. Peckham (In re Peckham), 442 B.R. 62, 73 (Bankr.D.Mass.2010).

In re Lauzon, 2012 WL 1198200 at *6-*7.

type of conspiracy existed for the purposes of defrauding the Individual Plaintiffs.

## V. CONCLUSION

In view of the foregoing, the Court shall enter a judgment in favor of the Debtor and

against the Plaintiffs on all counts of the Plaintiffs' Amended Complaint.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated:  September 19, 2012